IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
May 16, 2006 Session

## STATE OF TENNESSEE v. BILLIE JOE WELCH

**Appeal from the Roane County Criminal Court**
**No. 12763     E. Eugene Eblen, Judge**

**No. E2005-02293-CCA-R3-CD - Filed September 26, 2006**

The Defendant, Billie Joe Welch, was convicted of second degree murder, and the trial court sentenced him to eighteen years in the Tennessee Department of Correction. The Defendant now appeals, contending that: (1) the evidence was insufficient to support his conviction; (2) he received ineffective assistance of counsel; (3) the trial court improperly charged the jury on second degree murder; (4) the trial court erred when it answered a jury question off the record; and (5) the trial court improperly sentenced him. Finding no reversible error, we affirm the judgment of the trial court.

**Tenn. R. App. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which DAVID H. WELLES, J., joined. NORMA MCGEE OGLE, J., concurred in the results only.

Andrew Nathan Hall, Wartburg, Tennessee, for the appellant, Billie Joe Welch.

Paul G. Summers, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Scott McCluen, District Attorney General; and D. Roger Delp, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**

This case arises from the Defendant's conviction for the second degree murder of his wife, Shirley Welch. At the Defendant's trial, the following evidence was presented: Officer Bodell Smith, a sergeant with the Kingston Police Department, testified that on September 28, 2002, he and a fellow officer were dispatched to the Roane County Sheriff's Department to assist with a "potential situation." Before arriving at the department, the officer was told that there was a young man in the lobby who appeared to be upset and was not acting normally. Upon arrival, Officer Smith observed the Defendant, whom he had known for many years, and asked him if everything was all right. Officer Smith recalled that the Defendant said "no" and that the Defendant appeared disoriented as though something was wrong with him. The officer invited the Defendant to come outside to speak

with him, and, once outside, the Defendant told Officer Smith that he had killed his own wife. Officer Smith asked if the Defendant was sure he had killed his wife, to which the Defendant responded affirmatively. Then, the officer suggested that perhaps the Defendant had only injured his wife, and the Defendant indicated that he was certain his wife was dead, that he had shot her with a .9 millimeter automatic, and that there was "blood all over her." At that point Officer Smith told the Defendant not to say anything else, took him back inside, and instructed a corrections officer to have the Defendant secured until he could be Mirandized.

Jon French, an investigator with the Roane County Sheriff's Department, testified that on September 28, 2002, he was called to a crime scene at 729 Sweetwater Road between 5:00 and 7:00 p.m. Upon arrival, the police officers who had secured the scene directed the investigator to a small barn on the property. Inside the barn, the investigator observed the body of a white female sitting on a plastic box at the back of the room, and, near the body, he retrieved two .9 millimeter shell casings. Investigator French said that he had been told by some officers that there was a possibility that the murder weapon was located inside the Defendant's truck, which, at the time, was parked at the Defendant's brother's home. The investigator obtained the Defendant's written permission to search the truck, and, subsequently, recovered a .9 millimeter handgun from under the driver's seat. Investigator French recalled that the victim's body was transported to the University of Tennessee Hospital, where an autopsy was performed and two bullets were recovered from the body. He submitted the gun, the shell casings, and the bullets recovered from the victim's body to the Tennessee Bureau of Investigation ("TBI") Crime Laboratory for analysis

Prior to interviewing the Defendant, Investigator French read the Defendant his Miranda rights, and the Defendant waived those rights. The Defendant then gave and signed the following statement to Investigator French:

> On Saturday, the 28th day of September, 2002, at approximately 2:00 o'clock p.m. I was at my house at 729 Sweetwater Road. My wife, Shirley Welch, and I were separated and getting divorced. We had split the land, and I was going to put a trailer on my half. Myself and Wayne Brown were there, working on my part of the property. Shirley was working on a fence there at the house. I went down to the barn to get my saddles. Shirley came into the barn to see what I was doing. We had some discussion about things that belonged to me and things that belonged to her. While she was moving some stuff around I saw a .9 millimeter pistol laying on a buffet. I took the pistol and removed the magazine and it's "clip" which is what it is for one of those guns. As far as I know, the gun had been kept in the barn since Shirley took out the order of protection on me. Shirley began saying she was going to call the police on me. I told her all I wanted to do was walk away.

> I went outside the barn, and Shirley also came out. Shirley began screaming for my son and Wayne Brown to call 911. I pushed - - pursued Shirley back into the barn. Shirley grabbed the gun, and we started to scuffle. During the scuffle Shirley put the magazine back into the pistol. I got the gun away from Shirley and put it in

-2-

my pocket of my pants. Shirley never pointed the gun at me. After the scuffle we both ended up on the ground. Shirley set up against the back wall, and I stood up. I took the gun out of my pants pocket, and I remember it going off. I don't remember, but I believe it fired twice. I know one bullet struck her about the left eye.

I dropped the gun on the ground, and then I picked it up. I went to the house where my son was, and I called 911. My son was there, so I did not say a lot to 911. I went back to the barn to check on Shirley, and realized she was dead. I took my son and got into the truck, and drove toward Lenoir City, to my brother's house. I tried to call and could not get an answer. I ended up taking my son to a friend's house, Johnny Smith, in Kingston. Before I took my son to Kingston I called Charmaine Walden to meet us. I believe it was on Highway 305. Charmaine took us to Joni's, and my son stayed there. And [sh]e took me to the Sheriff's Department. I told Charmaine that I was in trouble.

She asked if I hit Shirley, and I told her yes. Charmaine took Gilbert Howard to get my truck to my brother's in Lenoir City. I did tell Charmaine that I had shot Shirley on the way to the Sheriff's Department.

Investigator French then identified some photographs and testified that he observed "stippling" around the entry wounds on the victim's body. He explained that stippling are small wounds caused by tiny projectiles that exit a gun with the bullet when the gun is discharged and that stippling occurs around an entry wound when someone is shot at close range. There was a good deal of stippling around both wounds on the victim's face, one of which was on the victim's left eye and the other of which was around the mouth or chin.

On cross-examination, Investigator French said that the Defendant was not delirious during the interrogation but acknowledged that he was a little upset. The investigator said that the Defendant never said he intended to shoot the victim.

Kyle Welch testified that he is the Defendant's and victim's son. He said that on September 28, 2002, the victim was outside working on a fence, and he was inside playing a computer game. At some point, Welch heard the victim screaming, and he quit playing the computer game and went outside, where he saw the Defendant dragging the victim into the barn by her arms. The victim told Welch to call 911, and the Defendant told Welch to go back inside. Welch said that he did not go back inside but, instead, sat down and cried because he did not know what to do. Welch said that after the Defendant and victim were back inside the barn he heard more yelling, but he could not understand what was being said. He then heard two loud sounds, which he described as sounding like "a board banging." Shortly thereafter, the Defendant emerged from the barn, Welch attempted to see if the victim was all right, but the Defendant instructed him to get into the Defendant's truck. Welch said that he was worried about the victim and scared of the Defendant.

Welch agreed that the Defendant and victim had a "stormy" relationship. He said that they argued frequently and that he once observed the Defendant holding the victim on the ground, choking her. Welch said that the only other person present during the incident in question was Wayne Brown.

Steve Scott testified as an expert witness that he works in the TBI's crime laboratory in Nashville as a firearms examiner. He testified that the two bullets recovered from the victim's body had been fired from the gun recovered from the Defendant's truck.

Dr. Sandra Elkins, an associate professor of pathology at the University of Tennessee, College of Medicine, testified that she is the Knox County Medical Examiner. Dr. Elkins was accepted as an expert witness, and testified that she performed an autopsy on the victim in September of 2002. Dr. Elkins indicated that the victim had been shot twice. The first bullet entered the left side of the victim's forehead and traveled from front to back in a downward direction and was recovered from the base of the victim's skull. The second bullet entered the victim's body just below her lower lip and also moved in a downward direction. The bullet then exited the victim's body from under the chin and reentered her body in the upper chest. This bullet was recovered in the lower part of the victim's left lung.

Dr. Elkins said that there was heavy stippling around both entrance wounds on the victim's face, in addition to soot from the gunshots on the victim's face. Dr. Elkins stated that, in general, soot is only present around a gunshot wound if the gun was fired from a distance of twelve inches or less. However, stippling can be present around a wound inflicted from up to twenty-four inches away. The doctor opined that both shots were fired from a distance of around twelve inches because there was heavy stippling but only a small amount of soot on the victim's face.

Dr. Elkins testified that the cause of death was gunshot wounds to the head and chest and that either wound alone would have been sufficient to produce death. She explained that the victim would have been able to survive only a few minutes because the first bullet went through her entire brain, and the second bullet went through the heart, aorta, and pulmonary artery. She said that the victim's heart would have only continued to beat for a maximum of five minutes.

Gilbert Wayne Howard testified that he has known the Defendant since the sixth grade, and the Defendant was a "fantastic" person, who loved his children, and was never violent with the victim. Howard had, however, witnessed the victim strike the Defendant in the back of the head with a frying pan for no reason, throw a knife at him, spit on him, and kick him in the groin.

Wayne Brown testified that he has known the Defendant for more than twenty-five years and that he has never witnessed the Defendant hurt anyone. He stated that he was present on the day that the victim was killed and that he saw the Defendant exiting the barn telling the victim, "[j]ust leave me alone," twice. He also heard the Defendant tell the victim that he just wanted to leave. Brown testified that he then saw the Defendant reenter the barn with the victim following, and then he heard a gunshot. When the Defendant reemerged from the barn, the Defendant instructed Brown to call

-4-

911. The Defendant told Brown to stay where he was while the Defendant took his son to his brother's house. Brown testified that the police arrived on the scene while the Defendant was gone, and he told them he did not hear anything and did not know anything because he was "terrified."

On cross-examination, Brown maintained that he did not share the information he had with the police because he was scared. He said that he later changed his mind when he found out that he could not be implicated in the crime. He stated that he never went into the barn to check on victim, because he "didn't think it concerned [him]."

Eva Louise Ellison testified that she is the Defendant's sister, and she described him as a loving father. She said that she had never seen the Defendant hit the victim but that she had seen the victim hit the Defendant on one occasions. Shirley Ann Rich testified that the Defendant is her brother, and she described him as a "great person."

Charmaine Walden testified that on February 28, 2002, she received a phone call from the Defendant, whom she described him as "real tore [sic] up, and upset." She met the Defendant and the Defendant's son at a truck stop. The Defendant appeared upset and confused and requested that Walden take his son to a place called "Joni's." The Defendant then took a notepad out and wrote, "Take Kyle to Joni's and take me to jail." Upon arriving at Joni's, the Defendant hugged his son, told him that he loved him, gave him all the money in his wallet, and told him to call Brown. After dropping the Defendant's son off, Walden asked the Defendant why he was so upset, and he responded that he thought he had shot the victim. Walden then took the Defendant to the Sheriff's Department.

Walden testified that she had briefly had an "intimate[]" relationship with the Defendant, after the victim had "thrown [the Defendant] out" of his house. She said that she ended the relationship because she felt that the Defendant was constantly with his children or doing things for the victim. Walden recalled that the victim had come to her house and her place of employment on several occasions and was threatening towards her. Walden also testified that the Defendant had told her that he still loved the victim.

The Defendant's testimony about the events surrounding the shooting largely replicated his initial statement to Investigator French but added a few relevant details. The Defendant asserted that he did not drag the victim into the barn, explaining that the area in front of the barn was muddy, as shown by the crime scene video, and the victim would have been muddy had he dragged her into the barn. The Defendant indicated that when he originally pulled the gun from his pocket after struggling with the victim he intended to commit suicide. He stated that he put the gun to his head and "squeezed [the trigger] pretty hard," but the victim convinced him not to shoot himself. The Defendant could not remember if he "started bringing the gun down, or she grabbed [him]," but he knew that, at that point the gun went off. The Defendant said that he never pointed the gun at the victim and never intended to kill her. The Defendant said that he dialed 911 and went back into the barn to inform the victim that he had called for help. He said that he did not remember forcing his son, Kyle Welch, into the truck, but he may have opened the door for him.

The Defendant intended to take Welch to his brother's house, but he could not contact his brother, so the Defendant called Walden, who picked them up. Subsequently, they dropped Welch off at Joni's, and then Walden took the Defendant to the Roane County Sheriff's Department where he gave his statement. The Defendant testified that he was rushed to complete his statement and that when he was finished he told Investigator French that the statement was not written down exactly as the events transpired. He further testified that he wrote: "Not exactly, but close enough," at the bottom of the page; however, he acknowledged that this notation was not present on any of the copies of his statement. The Defendant also stated that an order of protection had been taken out against him by the victim, but he did not understand why such an order had been issued.

Investigator French was recalled and testified that interviewees are never rushed through their statements and that they are given as much time as they need to complete their statements. He also stated that the Defendant never wrote or made a statement protesting the accuracy of the statement. Investigator French maintained that the Defendant's statement was read back to the Defendant and that he communicated what changes needed to be made, those changes were made, and the Defendant would have initialed any changes.

Based upon this evidence, the jury convicted the Defendant of second degree murder.

## II. Analysis

On appeal, the Defendant asserts that: (1) the evidence is insufficient to support his conviction; (2) he received ineffective assistance of counsel; (3) the trial court improperly charged the jury on second degree murder; (4) the trial court erred when it answered a jury question off the record; and (5) the trial court improperly sentenced the Defendant.

## A. Sufficiency of the Evidence

The Defendant's first contention is that the evidence was insufficient to support the Defendant's conviction for second degree murder.[1] When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 324 (1979); State v. Duncan, 698 S.W.2d 63, 67 (Tenn. 1985). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this

---

[1] After reviewing the record, we note that the Defendant's notice of appeal was filed five days late. See Tenn. R. App. P. 4(a). However, because this error is not jurisdictional, and, in the interest of justice, we will review this issue on its merits. Id.

Court substitute its inferences for those drawn by the trier of fact from the evidence. State v. Buggs, 995 S.W.2d 102, 105 (Tenn. 1999); Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas, 286 S.W.2d at 859. This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. Id.

The Defendant was convicted of second degree murder which is defined as "[a] knowing killing of another." Tenn. Code Ann. § 39-13-210 (a)(1) (2003). "Knowingly" means that a person acts with an awareness that his conduct is reasonably certain to cause the death of the alleged victim. State v. Page, 81 S.W.3d 781, 791 (Tenn. 2002) (appendix of suggested jury instructions). The Defendant does not dispute that he shot and killed the victim; however, he asserts that he never pointed the gun at the victim and did not intend to kill her. The evidence presented at trial, when viewed in the light most favorable to the State, established that, on September 28, 2002, the Defendant and victim were arguing in the barn on their mutual property. At some point during the argument, the Defendant came into the possession of a .9 millimeter handgun. Shortly thereafter, the Defendant and victim exited the barn, and the victim was yelling for their son to call 911. The Defendant responded by ordering their son to stay where he was, and then dragged the victim, by her arms, back inside the barn. Once back inside the barn, the Defendant shot the victim twice in the face from a distance of roughly twelve inches. The victim was unarmed. Either wound would have been sufficient to cause death, and the victim did, in fact, die from her injuries. Based on this evidence, a reasonable jury could have found the Defendant guilty of second degree murder, and the Defendant is not entitled to relief on this issue.

**B. Ineffective Assistance of Counsel**

The Defendant next asserts that he received ineffective assistance of counsel. The State counters that, in the absence of an evidentiary hearing, the record is entirely insufficient to prove that trial counsel was ineffective. This Court has consistently "warned defendants and their counsel of the dangers of raising the issue of ineffective assistance of trial counsel on direct appeal because of the significant amount of development and fact finding such an issue entails." Kendricks v. State, 13 S.W.3d 401, 405 (Tenn. Crim. App. 1999). Raising the issue of ineffective assistance of counsel on direct appeal is "a practice fraught with peril." State v. Thompson, 958 S.W.2d 156, 161 (Tenn. Crim. App. 1997). The defendant runs the risk of having the issue resolved "'without an evidentiary hearing which, if held, might be the only way that harm could be shown-a prerequisite for relief in ineffective trial counsel claims.'" Id. (quoting Jimmy Wayne Wilson v. State, No. 909, 1991 WL 87245, at *6 (Tenn. Crim. App., at Knoxville, May 29, 1991), *no Tenn. R. App. P. 11 application filed*).

Nonetheless, our Supreme Court has stated that claims of ineffective assistance of counsel may be presented on direct appeal and that the reviewing court must apply the same standard as utilized for such claims in post-conviction proceedings. See Burns, 6 S.W.3d at 461 n.5. Under the Sixth Amendment, when a claim of ineffective assistance of counsel is made, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland v. Washington, 466 U.S. 668, 687 (1984); see Lockhart v. Fretwell, 506 U.S. 364, 368-72 (1993). In other words, a showing that counsel's performance falls below a reasonable standard is not enough; rather, the petitioner must also show that but for the substandard performance, "the result of the proceeding would have been different." Strickland, 466 U.S. at 694. The Strickland standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

A defendant will only prevail on a claim of ineffective assistance of counsel after satisfying both prongs of the Strickland test. See Henley v. State, 960 S.W.2d 572, 580 (Tenn. 1997). The performance prong requires a defendant raising a claim of ineffectiveness to show that the counsel's representation fell below an objective standard of reasonableness or "outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690. The prejudice prong requires a defendant to demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. Failure to satisfy either prong results in the denial of relief. Id. at 697.

In Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975), our Supreme Court decided that attorneys should be held to the general standard of whether the services rendered were within the range of competence demanded of attorneys in criminal cases. Further, the Court stated that the range of competence was to be measured by the duties and criteria set forth in Beasley v. United States, 491 F.2d 687, 696 (6th Cir.1974), and United States v. DeCoster, 487 F.2d 1197, 1202-04 (D.C. Cir. 1973). Also, in reviewing counsel's conduct, a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689. Thus, the fact that a particular strategy or tactic failed or even hurt the defense does not, alone, support a claim of ineffective assistance. Deference is made to trial strategy or tactical choices if they are informed ones based upon adequate preparation. See DeCoster, 487 F.2d at 1201.

### 1. Failure to Call Rebuttal Witnesses

The Defendant's first contention regarding his trial counsel's ("Counsel's") performance is that Counsel's performance was deficient because Counsel failed to call two witnesses who could have rebutted testimony that the Defendant dragged the victim into the barn. Accompanying the Defendant's motion for a new trial were the sworn affidavits of Brittany Rena Rich and Michael Lee Barry. According to the affidavits, both Rich and Barry would have testified that during the summer of 2004, slightly less than two years after the incident in question but before the case was tried, Kyle

Welch told them that he had not seen or heard anything regarding the victim's death and that he was being pressured by family members to falsely testify. At the motion for a new trial, Welch testified that he never discussed the details of the case with Rich or Barry and that the information in their affidavits was incorrect. In order to prevail on this claim, the Defendant must prove that he was prejudiced. The prejudice prong requires a defendant to demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Further, a reasonable probability is a probability sufficient to undermine confidence in the outcome.

We conclude that Counsel's decision not to call these two witnesses to testify does not undermine confidence in the guilty verdict, especially in light of the weight of the evidence against the Defendant. Further, even if Counsel's decision not to call the rebuttal witnesses was based on a misunderstanding of the hearsay rule, as the Defendant's brief suggests, the Defendant's claim still fails, for the following reasons. We do not believe that if Rich and Barry had testified there is a reasonable probability that the result of the proceeding would have been different. The Defendant was convicted of second degree murder. There is no question that the Defendant fired the weapon that killed the victim, and, while the circumstances that brought the Defendant and victim back inside the barn are relevant as to the Defendant's state of mind, they do not necessarily relate to provocation. Whether he dragged the victim into the barn prior to shooting her is of minor importance. Therefore, even if the jury were to credit Rich's and Barry's testimony, this would not have necessarily shifted the verdict from second degree murder to voluntary manslaughter. In our view, the Defendant was not prejudiced by Counsel's decision not to call Rich and Barry. See id. at 694.

The Defendant also claims that he was prejudiced by Counsel's failure to call Gilbert Howard as a rebuttal witness to testify that Welch could not have seen the barn door from his position at the time of the incident. The State counters that what could be seen from the porch is irrelevant because Welch never testified that he observed anything from the porch.

In order to prevail on a claim of ineffective assistance the Defendant must prove prejudice. Because the record does not contain any statement by Welch indicating that he was on the porch when he observed the Defendant drag the victim into the barn, there is no reason to believe that Howard's testimony would have been meaningful to the jury. Thus, the Defendant has failed to prove that he was prejudiced by Howard not being called to testify. Because the Defendant has failed to meet his burden of proof, he is not entitled to relief on this issue.

## 2. Absence of Proof of Physical Evidence

The Defendant's next contention is that Counsel was ineffective because Counsel did not address the absence of testing for gunshot residue on the Defendant. The Defendant maintains that, by not forcing the State to test the Defendant's clothing for gunshot residue, Counsel did not force the State to prove every element of their case. The Defendant cannot force the State to test his clothing. Rather, he can have his own tests conducted. Counsel's decision not to have the clothing

tested to prove that the Defendant was the shooter was a tactical choice. Because the Defendant confessed to the killing upon arrival at the police station, gave a detailed written statement, and at trial maintained that the gun was in his hand when the victim was shot, it is reasonable that Counsel ruled out the necessity of testing the Defendant's clothing. Further, the Defendant cannot prove any prejudice because he conceded the fact that he was the shooter, but he maintained that the physical act of shooting the victim was an accident. The Defendant is not entitled to relief on this issue.

### 3. Failure to Connect the Defendant with the Murder Weapon

The Defendant also asserts that Counsel was ineffective because Counsel did not compel the State to prove that the murder weapon belonged to the Defendant and because Counsel did not object to the introduction of this weapon at trial. First we note that whether the murder weapon belonged to the Defendant is not an element of the crime that the State must prove beyond a reasonable doubt. Further, the Defendant has no avenue to compel the State to prove anything. He can only argue at trial that the State did not meet its burden of proof or at trial prove himself that the gun did not belong to him. During this trial, the Defendant admitted to shooting the victim but contended that the shooting was an accident. Whether the Defendant shot the victim and what weapon was used were never in contention, and he clearly cannot show that Counsel was ineffective or that he was prejudiced by Counsel's representation.

### 4. Failure to Suppress Written Statement

The Defendant next contends that he received the ineffective assistance of counsel because Counsel failed to file a motion to suppress the statement he gave to the police soon after the killing. The Defendant essentially argues that his mental condition may have prevented him from knowingly, voluntarily, and intelligently waiving his Constitutional rights before he gave the statements.

This Court has stated that, if arguable grounds exist to suppress incriminating evidence, then an attorney, as a zealous advocate for the client, should move to suppress that evidence. See Robert C. Bellafant v. State, No. 01C01-9705-CC-00183, 1998 WL 242449, at *6 (Tenn. Crim. App., at Nashville, May 15, 1998), *no Tenn. R. App. P. 11 application filed*. However, even if the Defendant's mental state provided arguable grounds for a motion to suppress, and his attorneys' failure to file the motion was deficient performance, the Defendant must demonstrate that he was prejudiced by the deficiency. In order to demonstrate prejudice, the Defendant would have to prove that his statements were inadmissible. To determine the admissibility of a statement, we look to the Fifth Amendment to the United States Constitution, which provides that, "No person . . . shall be compelled in any criminal case to be a witness against himself." Similarly, article I, section 9 of the Tennessee Constitution states that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." In Miranda v. Arizona, the United States Supreme Court held that pursuant to the Fifth and Fourteenth Amendments' prohibition against compelled self-incrimination, police officers must advise a defendant of his or her right to remain silent and of his or her right to counsel before they may initiate custodial interrogation. 384 U.S. 436, 479 (1966).

If these warnings are not given, statements elicited from the individual may not be admitted for certain purposes in a criminal trial. Stansbury v. California, 511 U.S. 318, 322 (1994).

A criminal defendant may waive his Miranda rights, but such a waiver must be made "voluntarily, knowingly, and intelligently." Miranda, 384 U.S. at 444. The waiver must be "made with full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." State v. Blackstock, 19 S.W.3d 200, 208 (Tenn. 2000) (citing State v. Stephenson, 878 S.W.2d 530, 544-45 (Tenn. 1994)). The State has the burden of proving the waiver by a preponderance of the evidence. State v. Bush, 942 S.W.2d 489, 500 (Tenn. 1997). In determining whether a defendant has validly waived his Miranda rights, courts must look to the totality of the circumstances. State v. Middlebrooks, 840 S.W.2d 317, 326 (Tenn. 1992). The totality of the circumstances in a case such as this one must reveal "an uncoerced choice and the required level of comprehension before a court can properly conclude that Miranda rights have been waived." Blackstock, 19 S.W.3d at 208.

In the case under submission, the only proof offered by the Defendant regarding the inadmissibility of his statements to the police was that Officer Smith testified that the Defendant seemed disoriented, and Investigator French testified that the Defendant was upset. Conversely, the State's proof showed that the Defendant had the presence of mind to call 911 after the shooting, yet not state the exact nature of the emergency in order to spare his son from hearing what had taken place. Additionally, the Defendant demonstrated a good deal of foresight by attempting to take his son away from the scene of the crime and giving him all of the money in his wallet before turning himself over to the police. The Defendant was Mirandized and did sign a waiver of his rights. His statement to the police was clear and detailed, showing the Defendant to be relatively calm and lucid in spite of the circumstances. Finally, Investigator French testified that, while the Defendant seemed a little upset, he was not delirious. After a thorough review of the record, we find nothing to indicate that the Defendant's statements were inadmissible; therefore, he was not prejudiced by Counsel's failure to file a motion to suppress his written statement, and the Defendant is not entitled to relief on this issue.

### 5. Failure to Object to the Introduction of Order of Protection

The Defendant next asserts that Counsel was ineffective because Counsel failed to object to the introduction of the order of protection issued against him. The State responds by arguing that the order of protection was introduced in response to Counsel's cross-examination of one of the State's witnesses.

The Defendant first addressed the issue of whether the police had ever been involved in any disputes between the Defendant and the victim during his cross-examination of Kyle Welch when the Defendant suggested that the police had never been involved in any such disputes. The order of protection was introduced by the State to rebut this testimony. Because this evidence was properly introduced and admissible as rebuttal proof, the Defendant did not suffer any prejudice from Counsel's failure to object to its introduction. While Counsel's cross-examination "opened the

door" to the admissibility of the order of protection, we cannot conclude that there is not a reasonable probability that the result of the proceeding would have been different but for Counsel's actions. The Defendant is not, therefore, entitled to relief on this issue.

## 6. State of Mind and Provocation

The Defendant also asserts that Counsel was ineffective because Counsel did not adequately explore a defense based on state of mind or provocation. The State counters this argument by noting that state of mind and provocation were not relevant, because the Defendant argued that the killing was accidental.

Although the Defendant could have argued that the killing was provoked, his statement to the police, as well as his trial testimony, portrayed the killing as an unfortunate accident rather than an intentional act by a provoked individual. The decision to maintain this version of the events, as opposed to arguing provocation, was a tactical choice. Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. Williams, 599 S.W.2d at 279-80. For the Defendant to have admitted that the killing was intentional, but provoked, may well have worked to his disadvantage because this version of the altercation would not comport with the Defendant's statement to the police. Because this was one of multiple strategic choices available, we do not believe that Counsel's representation fell below an objective standard of reasonableness or "outside the wide range of professionally competent assistance," thus, he is not entitled to relief on this issue. See Strickland, 466 U.S. at 690.

## 7. Conceding the Killing was Unlawful

The Defendant further contends that Counsel was ineffective because Counsel conceded that the killing was unlawful without requiring the trial court to define unlawful for the jury. It is apparent from the record in this case that the stipulation was part of Counsel's trial strategy. Counsel stated, in pertinent part:

> [I]t was an unlawful killing. We don't deny that. [The Defendant] doesn't deny that. One of the first things he did after he secured his son was to go turn himself in and admit that he shot his wife. So we don't deny that. It's not in dispute.
>
> What is in dispute is whether he acted intentionally . . . .

Counsel admitted that the killing was unlawful in the face of the Defendant's confession to the shooting and admission that the gun was in his hand at the time of the shooting. Counsel's strategy was to argue that the killing was an accident, thereby reducing the Defendant's culpability. The admission that the killing was unlawful established the Defendant's credibility of being honest with the police and the jury and allowed Counsel to focus his defense on the Defendant's level of culpability. We conclude that Counsel's actions did not fall below the standard of reasonableness and that the Defendant was not prejudiced.

### 8. Failure to Object to Lack of Jury Admonition

The Defendant's next contention is that Counsel was deficient because Counsel did not object to the trial court's failure to warn the jury not to discuss the case among themselves outside of deliberations. In his brief on this issue, the Defendant fails to cite to any evidence showing that the jury held improper deliberations due to the court's lack of a complete jury admonition. Further, there is no evidence in the record that the judge so failed to warn the jury. Absent such proof, the Defendant has not met his burden of proof, and he is not entitled to relief on this issue.

### 9. Failure to Object to State's Improper Comment

During voir dire, the State made the following comments:

> The Court will tell you the elements that the State has to prove beyond a reasonable doubt. And I can guarantee you in this case, and every other case you sit on, at the end of the case you're going to have questions. You're going to have a multitude of questions. Can you, as jurors, decide whether those questions you have are really important to the decision you have to make? And if not, can you set them aside?

> For a couple of reasons - - two or three reasons. There's no way we could bring you everything you might want to know. There's some things that we don't know, that nobody knows in any given case. There's other information that you're not entitled to hear. The Court decides out of all the information from either side, what you can hear and what you can't. There are some things that are suppressed that are inappropriate for you to hear about. And that may answer some of the questions you have.

> And . . . there's a third reason, and it may be the most important to you folks. You're dreading the idea of being here two days. Do you want to spend two weeks here?

> So can you all look very carefully at the decisions you have to make, and decide those, and not worry about other things?

The Defendant maintains that these comments were an attempt to convince the jury that they could find the Defendant guilty even if the evidence was not sufficient, and therefore warranted an objection by counsel. We agree with the State's assertion that these comments appear to be an attempt to explain the trial process to the jury. The Defendant is not entitled to relief on this issue.

### 10. Failure to Object to Videotaped Evidence

The Defendant also contends that Counsel was deficient because Counsel failed to object to the introduction of a videotape, which had been edited by the State. The State asserts that the procedure used to edit the tape was approved by the trial court and that the manner in which the tape was presented was not prejudicial or inflammatory. Beyond the blanket assertion that Counsel was ineffective because Counsel did not object to the introduction of the videotape in question, the Defendant does not state a reason why Counsel should have objected. The Defendant does not allege that the contents of the videotape were unfairly detrimental to his defense or that the State presented the videotape evidence improperly. The Defendant has not met his burden of proving that Counsel was ineffective or that he was prejudiced. The Defendant is not entitled to relief on this issue.

### C. Jury Instruction

The Defendant next asserts that the trial court improperly charged the jury on second degree murder. Specifically, the Defendant contends that because the trial court placed the paragraph defining the distinction between second degree murder and voluntary manslaughter after the jury instruction for voluntary manslaughter, instead of immediately after the jury instruction for second degree murder, the jury was precluded from considering whether the Defendant acted in a "state of passion," and thereby precluded from returning with a voluntary manslaughter conviction. The State responds by stating that the trial court properly charged the jury and properly instructed the jury regarding the distinction between second degree murder and voluntary manslaughter.

The trial court instructed the jury as to all of the appropriate lesser-included offenses of first degree murder. The court then instructed the jury that they were to first consider the Defendant's guilt of the indicted offense of first degree murder. If the jury found the Defendant guilty of first degree murder, they were to so indicate on the verdict forms and cease deliberation. However, if the jury found the Defendant not guilty of first degree murder, the court instructed them to proceed to determine the Defendant's guilt of the lesser-included offense of second degree murder. If the jury found the Defendant guilty of second degree murder, they were to indicate the conviction on the verdict forms and cease deliberation. However, if the jury found the Defendant not guilty of second degree murder, the jury was to determine the Defendant's guilt of the lesser-included offense of voluntary manslaughter.

This court has repeatedly upheld "acquittal-first" instructions. See State v. Raines, 882 S.W.2d 376, 381-82 (Tenn. Crim. App. 1994); State v. McPherson, 882 S.W.2d 365, 375 (Tenn. Crim. App. 1994); State v. Rutherford, 876 S.W.2d 118, 119-20 (Tenn. Crim. App. 1993). However, the point of contention in the case under submission is not simply the fact that the jury instructions were sequential but that the "state of passion" instruction differentiating between second degree murder and voluntary manslaughter was placed after the voluntary manslaughter charge instead of after the second degree murder charge.

The Tennessee Pattern Jury Instruction for second degree murder includes the following as part of the charge: "The distinction between voluntary manslaughter and second degree murder is that voluntary manslaughter requires that the killing result from a state of passion produced by

adequate provocation sufficient to lead a reasonable person to act in an irrational manner." In the case at bar, the trial court gave a proper second degree murder jury charge; however, the paragraph noting the distinction between second degree murder and voluntary manslaughter was placed after the voluntary manslaughter jury charge.

This court previously examined this issue and determined:

The jury does have a duty to determine the grade of the offense, but the "sequential" instruction given to the jury was not violative of this duty under Tennessee law. . . . The sequential jury instruction did not preclude the jury from considering the lesser charges. This is evident from the jury's finding of guilt of second degree murder rather than first degree murder.

Raines, 882 S.W.2d at 382. This Court has previously observed that the better practice may be to adhere to the Tennessee Pattern Jury Instruction's approach to this situation, see State v. Earnest Gwen Humphrey, No. M2003-01489-CCA-R3-CD, 2005 WL 2043778, at *14-15 (Tenn. Crim. App., at Nashville, Aug. 24, 2005), *perm. app. denied* (Tenn. Feb. 6, 2006). However, this Court has recently affirmed a conviction for second degree murder in a case involving jury instructions that were similar to those given in the case under submission. See State v. Walfrido L. Rodriguez, No. M2005-01351-CCA-R3-CD, 2006 WL 1626845, at *3-4 (Tenn. Crim. App., at Nashville, June 7, 2006), *Tenn. R. App. P. 11 application filed* (July 31, 2006). Further, we recognize, as did the Rodriguez Court, the potential that a jury deliberating sequentially on second degree murder might disregard the effect of passion resulting from adequate provocation. Id. at *4. However, prior to their deliberations, the jury in the case under submission was fully and accurately instructed concerning provocation, passion, and the difference between second degree murder and voluntary manslaughter. Therefore, we conclude that this issue is without merit.

### D. Trial Court's Oral, Ex Parte Response to Jury Question

The Defendant next asserts that the trial court erred when it responded orally to a jury question regarding whether it should proceed from its consideration of second degree murder to consider voluntary manslaughter. The Defendant further argues that this error was compounded by the Defendant's absence during the oral instruction, which qualifies the communication as an impermissible ex parte communication. The State argues that because the communication in question amounted to a supplemental jury instruction, the instruction did not need to be reduced to writing.

There is no record of the jury's question or the trial court's response, however, during the Defendant's sentencing hearing, the Defendant's appellate counsel questioned the Defendant's trial counsel regarding her recollection of the interaction in question. Additionally, the trial court and the State's attorney commented on the record regarding their remembrances of the colloquy. Their collective memory of the events was that, during the jury's deliberation, the jury sent a note to the trial court stating that they were deadlocked at six to six on second degree murder. The jury wished

to know whether to proceed to voluntary manslaughter. The trial court instructed the jury that if they were deadlocked on a particular charge, they were to proceed to the next charge, although the trial court did not tell the jury to which charge to proceed.

As the Defendant correctly asserts, the trial court must reduce every word of the charge relative to felony offenses to writing, read the written charge to the jury, and give the written form to the jury to have during deliberations. Tenn. R. Crim. P. 30(c). The question in this case is whether the court's supplemental instruction fell within the ambit of Rule 30(c).

This Court has said that a supplemental instruction that is merely for clarification purposes is not governed by the writing requirement of Rule 30(c). See State v. Tywan Faulk, No. M1999-01124-CCA-R3-CD, 2000 WL 1278375 at *7 (Tenn. Crim. App., at Nashville, Aug. 31, 2000), *perm. app. denied* (Tenn. Dec. 4, 2000). However, we have held that when these comments amount to the judge commenting to the jury that it is discussing the right and redefining that issue they are highly "irregular" and "improper." See State v. Crocker, 697 S.W.2d 362, 365 (Tenn. Crim. App. 1985). In Crocker, we concluded that the issue was waived by the Defendant for his failure to interpose any objection to the trial court's action. Id.

In the context of this case, it is unnecessary for us to decide which is the correct position. Even if the failure to submit a supplemental instruction in writing is error, it is cause for reversal only if it more probably than not affected the judgment. Tenn. R. App. P. 36(b); State v. Gorman, 628 S.W.2d 739, 740 (Tenn. 1982); see State v. Jason Thomas Beeler, No. W1999-01417-CCA-R3-CD, 2000 WL 1670945, at *36 (Tenn. Crim. App., at Jackson, Nov. 2, 2000), *no Tenn. R. App. P. 11 application filed*. In the context of evaluating whether an erroneous charge has been harmful, our Supreme Court has prescribed review of the entire charge to determine whether the error was prejudicial. Gorman v. Earhart, 876 S.W.2d 832, 836 (Tenn. 1994).

The Defendant has failed to articulate any prejudice that befell him as a result of the trial court's action. It is clear from a review of the record that both attorneys agreed to the supplemental instruction given, and both attorneys were present when the instruction was given. Upon review of the record and the entire charge, we are unconvinced that the trial court's failure to submit the supplemental instruction in written form more probably than not affected the judgment to the Defendant's detriment.

With regard to the Defendant's contention that the trial court's ex parte communication with the jury constituted reversible error, we note that this court has previously warned that trial courts should discontinue the practice of communicating with deliberating juries. State v. Mays, 677 S.W.2d 476, 479 (Tenn. Crim. App. 1984). Our Supreme Court has held that these types of communications are always error and should not occur. Spencer v. A-1 Crane Service, Inc., 880 S.W.2d 938, 941 (Tenn. 1994). To prevent even the appearance of judicial partiality or unfairness, any proceeding involving the jury after it has retired for deliberations should be conducted in open court and in the defendant's presence. State v. Tune, 872 S.W.2d 922, 929 (Tenn. Crim. App. 1993); Smith v. State, 566 S.W.2d 553, 559-60 (Tenn. Crim. App. 1978). The proper method of fielding

jury questions during deliberations is to recall the jury, counsel for both parties, the defendant, and the court reporter and to resolve the matter on the record. Mays, 677 S.W.2d at 479. The failure to follow the proper procedure, however, is subject to harmless error analysis. Tune, 872 S.W.2d at 929; Mays, 677 S.W.2d at 479. If the defendant has not been prejudiced by an inappropriate response, reversal is not required. Tune, 872 S.W.2d at 929.

As stated previously, the record reflects that during jury deliberations the jury asked the trial court if they should proceed to the next charge because they were deadlocked on second degree murder. The trial court instructed the jury that if they could not reach a verdict on a particular charge, they were to move on to the next sequential charge. It is clear that counsel for both the Defendant and the State were present and that neither had any objection to the trial court's instruction. In our view, the Defendant suffered no prejudice from the communication in question, and while we recognize that the better practice is to refrain from directly communicating with a deliberating jury unless in open court, on the record, and in the presence of counsel and the defendant, in the case at bar, the Defendant is not entitled to relief on this issue.

### E. Sentencing

We now turn to address the Defendant's contention that the trial court improperly enhanced his sentence pursuant to Blakely v. Washington, 542 U.S. 296 (2004). Our Supreme Court concluded that Blakely neither announces a new rule of constitutional law nor invalidates Tennessee's sentencing scheme, by which a trial court is permitted, rather than required, to enhance a sentence within the statutory range based on its finding of relevant enhancement factors. State v. Gomez, 163 S.W.3d 632 (Tenn. 2005). Accordingly, the Defendant is not entitled to relief on this issue.

### III. Conclusion

In accordance with the foregoing reasoning and authorities, we conclude that there exists no reversible error in the judgment of the trial court. Therefore, the judgment of the trial court is affirmed.

_____
ROBERT W. WEDEMEYER, JUDGE

-17-